UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| NASHWAN AL-RAMER ABDULRAZZAQ,<br>    aka Abdul Hadi al Iraqi,<br>    aka Nashwan al Tamir,<br><br>        Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, President, et al.<br><br>        Respondents. | Case No. 1:17-cv-1928 EGS |

**MOTION FOR A PRELIMINARY INJUNCTION**

    Nashwan al-Tamir has moved to reopen the constitutional claims that were previously stayed. He is still detained at Naval Station Guantanamo Bay, although he is now serving a prison sentence that was imposed by the military commission pursuant to a pretrial agreement. He has serious medical issues that require ongoing treatment, and he is disabled to the point that he cannot independently care for himself.

    As part of his pretrial agreement, the government promised to "pursue transfer to a third-party sovereign nation" (i.e., somewhere *other* than Iraq, one of the countries of his citizenship). (Ex. 1 at 5 (pretrial agreement).) The government now says it intends to transfer him to Iraq as soon as January 13, 2024, to serve his U.S. prison sentence. His § 2241 asks the court to prohibit this transfer because it violates the U.S. Constitution and federal laws.

    However, if the court does not order interim relief while the petition is pending, Mr. al-Tamir will be irreparably harmed. For this reason, he asks the court to issue a preliminary

injunction that prohibits his transfer to Iraq while this petition is pending.

# FACTS

The relevant facts are stated in Mr. al-Tamir's 2017 § 2241 motion (ECF No. 1) and a new petition filed in *al-Tamir v. Biden, et al.*, case no. 1:25-cv-15 (Jan. 3, 2025). He incorporates the facts stated in these pleadings by reference. Those facts are summarized briefly brief here.

### I.  *Medical problems*

The CIA captured Mr. al-Tamir in 2006, and he was transferred to Naval Station Guantanamo Bay in April 2007. He remained at Guantanamo without charges being filed until 2014. During this time, he suffered tremendously as a result of chronic and worsening degradation of his spine. In 2017, he suffered his first medical emergency, cauda equina syndrome, requiring an emergency spinal surgery at Guantanamo. The government aggravated Mr. al Tamir's medical issues by subjecting him to negligent medical care, including the unavailability of needed medical devices (such as an MRI machine) and adequately trained surgeons and medical specialists at Guantanamo. Mr. al-Tamir's inadequate medical care was the subject of extensive litigation in the military commission and this court. and that litigation came to a head in April 2022, when Mr. al-Tamir asked the military tribunal to abate the prosecution until he could get an MRI and adequate medical care.

Mr. al Tamir's medical litigation was multifaceted. It involved countless discovery requests simply to obtain his medical records and understand what his medical care he was actually getting. There were also multiple requests to abate the criminal proceedings until Mr. al Tamir could receive adequate care from specialists from off the island with access to the necessary medical equipment. To this day, Mr. al Tamir requires multiple daily medications, expert medical care, neurological imaging, and an extensive number of medical devices necessary just so he can perform daily functions.

## II. *Plea negotiations*

In 2022, with the assistance of defense counsel, Mr. al-Tamir reached a plea agreement in the criminal case. He agreed to admit guilt to four counts and participate in an extensive debrief. In exchange, the government agreed that the ultimate prison sentence could not be more than 10 years. (Ex 2 at 1 (Appendix to pretrial agreement).) It also promised to "pursue transfer to a third-party sovereign nation." (Ex 1 at 5.) And part of this promise was a commitment that the government would consider Mr. al-Tamir's "healthcare needs" in its "efforts to effect a transfer." (*Id.*)

These promises were critical to Mr. al-Tamir. As a convicted military combatant and a practicing Sunni, he could not be returned safely to Iraq or imprisoned there. Moreover, his acute medical diagnoses—which included degenerative spinal disease, an osteoporotic spine, and a history of multiple spinal surgeries—meant that transfer to a country that could not or would not provide adequate medical care would be inhumane and likely fatal. To ensure an appropriate resettlement was achieved, the parties agreed to delay sentencing until June 2024, and Mr. al-Tamir retained the right to withdraw his plea agreement at any time prior to sentencing. (Ex. 1 at 2; Ex. 3 at 3.) Mr. al-Tamir relied on the government's promises at three critical points: when he entered his guilty plea in 2022, when he debriefed with federal agents in May-June 2024, and when he went forward with sentencing rather than withdrawing his plea in June 2024.

In June 2024, a military panel, after presentation of evidence by the defense and the government, recommended a sentence of 30 years for Mr. al Tamir. On December 5, 2024, the convening authority announced the final sentence: 30 years in prison with 20 years suspended. As calculated by the State Department, this sentence will run until 2032.

## III. *Breach of the pretrial agreement*

From the point at which transfer under the pretrial agreement was contemplated as a

condition, defense counsel was in frequent communication with government officials about the details of that transfer. The government, however, shared few details about its efforts to secure a third-party sovereign to take Mr. al-Tamir, and for much of the time it prohibited the defense team from looking on its own for a third-party country. Nonetheless, the government consistently claimed it was pursuing a suitable transfer country and acknowledged that Mr. al-Tamir could not safely return to Iraq.

Without giving notice to Mr. al-Tamir or his defense counsel, the government notified Congress on December 13, 2024, that it intended to send Mr. al-Tamir back to Iraq. The first time the government informed defense counsel of this plan was in a meeting a week before Christmas. Government officials informed defense counsel that they had concluded Iraq was the "only" option for Mr. al-Tamir and that they had arranged a transfer to Iraq, where Mr. al Tamir could serve out his sentence in an Iraqi prison.

These officials told defense counsel the Iraqi government would hold Mr. al-Tamir in the al-Karkh prison outside of Baghdad for the rest of his sentence, which they believed would end in 2032. Mr. al-Tamir objected to the transfer on the grounds that such a transfer was unconstitutional and violated international treaties. The government officials insisted that Iraqi representatives said they could meet Mr. al-Tamir's medical needs, but it was apparent that the State department had relied on Iraqi representations without doing due diligence. Despite Mr. al-Tamir's objections, the government stated its intent to transfer Mr. al-Tamir to Iraq during the week of January 12, 2025.

## IV.    *Risk of torture if returned to Iraq.*

The risks posed by transfer to Iraq are well documented. As recently as 2023, the State Department concluded that it had found credible evidence of "[s]ignificant human rights issues" that include:

> arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture and cruel, inhuman, and degrading treatment or punishment by government officials; harsh and life-threatening prison conditions; arbitrary arrest or detention; arbitrary or unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including attacks resulting in civilian deaths and harm; . . . restrictions on freedom of movement, including forced returns of internally displaced persons to locations where they faced threats to their lives and freedom; refoulement of refugees to a country where they would face torture or persecution, including serious harm such as a threat to life or freedom or other mistreatment that would constitute a separate human rights abuse; serious government corruption.

U.S. State Dept., Bureau of Democracy, Human Rights, and Labor, *Iraq 2023 Human Rights Report* (2003), *available at* https://www.state.gov/wp-content/uploads/2024/03/528267_IRAQ-2023-HUMAN-RIGHTS-REPORT.pdf (last accessed Jan. 1, 2025).

A more recent news report specifically addresses the inadequacies of Iraq's justice system and the danger of its jails:

> Prisoners and detainees in Iraqi jails are enduring severe hardships, including significant delays and restrictions on visits from their relatives. In some prisons, it can take up to three months for family members to see their detained loved ones, a situation that has drawn sharp criticism from human rights organizations and activists. . . . . Under the current prison regulations, inmates are permitted to see their family or lawyer twice a month. However, in prisons such as Taji and Nasiriyah Central Prison (al-Hoot), visits are frequently banned for up to three months. . . .
>
> There have also been allegations of bribes being demanded for basic necessities like food and clothing.
>
> The Iraqi Center for Documenting War Crimes recently reported that 50 prisoners have died from torture in Iraqi prisons this year alone. The center highlighted the poor conditions under which tens of thousands of detainees are held, with health issues being neglected due to revenge and sectarian motives. Deaths have been

5

> recorded not only in prisons under the Ministries of Justice, Interior, and Defense but also in secret militia-run facilities. . . . .
>
> [Prominent political figure Misha'an al-Jibouri] noted that authorities sometimes prevent family visits to conceal the harsh realities of prison life. Some inmates have reportedly not seen their relatives for nearly seven years. Al-Jibouri also claimed that prisoners are often forced to pay for food and drink, exacerbating their already dire circumstances.
>
> The situation of prisoners in Iraq remains a critical human rights issue, with urgent calls for reform and better conditions to protect the rights and dignity of detainees.

Kurdistan24, *Death, torture, delayed visits: inside Iraq's harrowing prison system* (June 29, 2024), *available at* https://www.kurdistan24.net/en/story/395582/Death,-torture,-delayed-visits:-inside-Iraq%27s-harrowing-prison-system (last accessed Jan. 1, 2025).

Arabic news sources have reported on a recent report released within the last week by the Justice Network for Prisoners in Iraq, which concluded: "More than 80 percent of Iraq's prisons and detention centres are unfit for human habitation." Dana Taib Menmy, The New Arab, *Crisis in Iraqi prisons: overcrowding, widespread abuses, and systematic failings* (Jan. 1, 2025), *available at* https://www.newarab.com/news/crisis-iraqi-prisons-overcrowding-and-widespread-abuses; Shafaq News, *Iraqi prisons "Unfit for Human Life," NGO warns* (Dec. 29, 2024), *available at* https://shafaq.com/en/Iraq/Iraqi-prisons-Unfit-for-Human-Life-NGO-warns (last accessed Jan 1, 2025).

The report also criticized the lack of adequate medical care in Iraq's prison system:

> "'Clinics designed for a small number of inmates are now overwhelmed, providing services to far more than their capacity.' . . . Health services in detention centres are particularly under-resourced, often failing to meet the needs of overcrowded facilities. *Inmates with critical health conditions frequently face delays in accessing external hospital care due to procedural inefficiencies*.

*Id.* (emphasis added). "International organisations, including Human Rights Watch (HRW), have consistently condemned Iraq's prison conditions," documenting "overcrowding, unsanitary

6

environments, and widespread abuse, with skin and infectious diseases rampant among inmates." *Id.* (reporting that "prison capacity had reached 300 percent"). HRW also "estimates 8,000 individuals are on death row in Iraq, with reports of torture-tainted confessions and secret executions . . . . Families of victims have alleged harassment and denial of funeral rites or independent autopsies." *Id.*

The fact that Mr. al-Tamir is a Sunni (the minority religion), a citizen of Afghanistan, and an American convict make him a prime target for discrimination and violence in an Iraqi prison. *See, e.g.,* CBS News, *Shawki Omar, U.S. citizen held in Iraq prison, abused and discriminated against, wife claims* (Apr. 24, 2013) (reporting that Shawki Omar was sent to prison in Iraq after claims by the U.S. government that he "was unlikely to be tortured when it handed him to the Iraqi justice system"; however, he discovered he was a target for violence "discriminated against on three different levels there" for being a Sunni and American citizen "who was apprehended by U.S.-led forces in Baghdad nearly a decade ago on suspicion of fomenting jihad"), *available at* https://www.cbsnews.com/news/shawki-omar-us-citizen-held-in-iraq-prison-abused-and-discriminated-against-wife-claims/ (last accessed Jan. 2, 2025).

In light of the government's consistent agreement prior to December 2024 that Mr. al-Tamir cannot safely return to Iraq, the government now appears to have turned a blind eye towards this evidence. The risk of permanent harm justifies a preliminary injunction against the immediate transfer of Mr. al-Tamir to an Iraqi prison to serve his sentence.

## ANALYSIS

The D.C. Circuit has held that a "district court has the authority to grant [a petitioner] preliminary relief" and enjoin his transfer to a foreign country while he challenges the legality of the transfer. *Belbacha v. Bush*, 520 F.3d 452, 456 (D.C. Cir. 2008).

The court in *Belbacha* explained the considerations that must be made before issuing a preliminary injunction:

> In deciding whether to issue a preliminary injunction, the courts consider four factors: (1) whether the moving party has a substantial likelihood of success on the merits; (2) whether the moving party faces irreparable harm absent the preliminary injunction; (3) whether the injunction would substantially injure the opposing party; and (4) whether the injunction furthers the public interest.

*Id.* at 459 (quoting *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C.Cir.2007)).

The court is not required to weigh these considerations equally: "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995)). Applying this principle in *Belbacha*, the court concluded that although it was "far from clear" that Mr. Belbacha had a substantial likelihood of success on the merits, the injunction still could be granted "in light of the seriousness of the harm he claims to face, namely, torture at the hands of a foreign state and of a terrorist organization." *Id*.

## I. Risk of irreparable harm.

Here, all four factors weigh in favor of granting a preliminary injunction. As in *Belbacha*, the likely harm caused by a transfer to Iraq would be irreparable: "torture at the hands of a foreign state" or at the hands of someone in a dangerous prison environment who seeks retribution for who he is and what he has done. If he is not killed, failure to provide necessary medical care will be a death sentence on its own. Even if he is ultimately unsuccessful in proving the likelihood of these outcomes, the irreparable harm they pose justifies an injunction on its own.

## II. Substantial likelihood of success on the merits.

Unlike in *Belbacha*, Mr. al-Tamir's claims have "a substantial likelihood of success on the merits." *Id.* This is not a case where he relies on outdated country reports. His petition

8

identifies three recent reports that warn against the risk of torture in Iraq. Whatever the government may have to say about the quality of the NGO reports, it cannot credibly challenge its own findings in the 2023 Human Rights Report issued by the State Department. The government cannot credibly disavow the position it has taken since it entered the plea agreement in 2022 that Mr. al-Tamir cannot safely return to Iraq. There is a substantial likelihood that Mr. al-Tamir will prevail under the Convention Against Torture. (*See* Case no. 1:25-cv-15 at 19-20.)

There is also a substantial likelihood that Mr. al-Tamir will be able to establish that the government has breached the plea agreement because the decision in December to seek repatriation to Iraq is directly contrary to the terms of the plea agreement. (*See id.* at 20-22.) As discussed in Mr. al-Tamir's motion to reopen (ECF No. 182 at 2), this breach is a reason to grant relief under the claims filed in this case. The military commission is constitutionally deficient because it does not have any mechanism for Mr. al-Tamir to challenge the breach in the tribunal. Unlike a federal court that maintains authority to oversee the execution of the sentence imposed and entertain a motion to remedy prosecutorial breach, the military commission has no way for a defendant like Mr. al-Tamir to seek relief.

Finally, there can be no credible argument that this transfer complies with the legal requirements for a prisoner transfer. (*See* Case No 1:25-cv-15 at 22-24.) The proposal to force Mr. al-Iraqi to serve his sentence in Iraq against his will violates the requirements of 18 U.S.C. § 4107. And the urgency to accomplish the transfer on January 13, 2025, violates Mr. al-Iraqi's statutory and constitutional right to effective assistance of counsel.

### III.     *A preliminary injunction causes <u>no injury</u> to the government.*

On the flip side, a preliminary injunction will cause *no harm* to the government. The government has never suggested that Iraq imposed a January 13 target date. Such claim would be unbelievable because it has been less than a month since the possibility was first presented to Mr.

9

al-Tamir. There is no sound reason to believe that a delay will prevent the government from accomplishing the proposed transfer at the *end* of litigation if Mr. al-Tamir is ultimately unable to prove his claims.

Other than the continued costs of detaining Mr. al-Tamir, which the government willingly undertook when it detained him almost two decades ago and again when it sought a prison sentence, Mr. al-Tamir cannot imagine *any* harm that the government will suffer from a preliminary injunction.

On the flip side, the government has an interest in ensuring that the transfer complies with the Constitution and international treaties. The government's haste to carry out the transfer so quickly undermines its interest in doing justice and ensuring that its own rules are followed. A hasty transfer will undermine the government's interest in preserving the rule of law; a delay to protect the status quo, by contrast, causes it no injury at all.

## IV.     *A preliminary injunction furthers the public interest.*

This court is surely aware of the widespread domestic and international criticism of the government's actions at Guantanamo Bay for the last two decades. And this court knows better than any other entity how hard the detainees there have tried to get out. Against this backdrop, the public interest is not served by a government transfer from Guantanamo to some place that is probably even worse. Whatever fate the future holds for Guantanamo, the public interest is not served by rushing him away from there and into an Iraqi prison without first taking the time to make sure such transfer is lawful.

The public is best served by transparency, something that the government's haste obscures. The litigation in federal court will allow the public to see what is happening in Iraq and at Guantanamo. The public has a strong interest in understanding why Mr. al-Tamir would take the position he has taken and in ensuring his fear is not lightly ignored. Transparency requires

10

the government to proceed more deliberately and openly. Where the government refuses to do so on its own, this court must enjoin the government from acting until the dispute is resolved.

## CONCLUSION

The fact that Mr. al-Tamir fears returning to Iraq (where he would be able to see his family) more than he fears staying at Guantanamo (where he has not been well cared for and may ultimately die), speaks forcefully to the need for a preliminary injunction. The court should find that Mr. al-Tamir has made a sufficient showing to warrant interim relief under *Belbacha*.

Counsel has conferred with attorneys for the government, and they oppose this motion.

DATED this 3rd day of January 2025

        SCOTT KEITH WILSON (Utah Bar #7347)
        Federal Public Defender

        */s/ Benjamin C. McMurray*
        BENJAMIN C. McMURRAY (Utah Bar #9926)
        benji_mcmurray@fd.org
        Office of the Federal Public Defender
        District of Utah
        46 W. Broadway, Suite 110
        Salt Lake City, Utah 84101
        Telephone:   801-524-4010